## BANK *v*. HARPER.

Bail in error, who by reason of his liability pays the costs in an action of ejectment, may take an assignment of the judgment therefor, and recover the same by execution against the original defendants.

Upon the entry of an amicable action of ejectment, they, who are there made parties, are liable for all costs which may accrue. It is too late after verdict and judgment for one of two defendants to say, that he had no interest in the result: if his name was improperly used, or without his consent, he must resort to those who used it.

The parol evidence of payment by the surety in this case is not sufficiently rebutted by that of the defendant in error.

In error from the Common Pleas of Cumberland county.

*June* 1. This case originated in an indictment in the Quarter Sessions, for cutting timber on the land which became the subject of controversy. When the indictment came on for trial, the prosecutors and defendants agreed to convert it into an amicable action of ejectment, in which the Farmers' and Mechanics' Bank were made plaintiffs, and John Harper and Sarah Miller, defendants. At the trial of the cause, a verdict and judgment were rendered for the plaintiffs. The defendants, thereupon, sued out this writ of error, on the oath of John Harper, one of the defendants, who entered into the recognisance with Michael Holcomb and Daniel Eckles, as sureties. The judgment of the court below was affirmed, and the record returned to the Common Pleas. A suit was brought upon the recognisance of bail, when Holcomb and Eckles gave their judgment bond for the amount, whereupon the plaintiff made the following assignment to them :—

"Farmers' and Mechanics' Bank ⎫ No. 286, August Term, 1843,
　　　　*v.*　　　　　　　　　　⎬ in the Court of Common Pleas
John Harper and Sarah Miller. ⎭ of Cumberland county.

"For value received I do hereby assign, transfer, and set over

Vol. VIII.—32

to Daniel Eckles and Michael Holcomb the sum of $117.13, in this case due and owing from the defendants to the plaintiff, at the risk of the said Eckles and Holcomb, and without any recourse to the said plaintiff or to me, in the event of failing to recover or collect the same from the said defendants, or any recourse to the plaintiff or to me, for the costs of any proceeding to collect the same."

The bond was given in evidence, with a receipt in the handwriting of John Harper upon it, for the payment of the money by Daniel Eckles.

A *fieri facias* and attachment were issued by Eckles upon the original judgment in ejectment, to recover the amount of the costs which he alleged he had paid, and which was levied upon the property of Sarah Miller. · She appeared, and asked the court to set aside the execution, on two grounds : 1st, that the judgment was not the subject of assignment, being for a tort : and 2d, if it were, the payment was not made by Eckles, but by Harper, one of the original defendants : and therefore the execution should be set aside.

HEPBURN, P. J., was of opinion, that the execution ought to be set aside on the first ground, and therefore said little on the second ; but the case turning upon the facts, in this court, it is necessary to give the evidence :—

"Edward Shower, being duly sworn, deposes and says : I bought a judgment bond from L. G. Brandebury, given of Michael Holcomb and Daniel Eckles, amounting to $117 or $118, in favour of the Farmers' and Mechanics' Bank. Mr. Brandebury said it was for costs in the suit of the Farmers' and Mechanics' Bank against John Harper and Mrs. Miller; neither of the parties to the bond ever spoke to me upon the subject of paying it, or something of that kind. Some time after the bond was due, Harper spoke to me. [Plaintiffs here object to any declaration of John Harper being given in evidence.] Harper wished me not to hand the bond entered up; that he was going to Perry county in a few days, where he was to get money; and as soon as he returned the bond should be paid. In a day or two after, Harper returned from Perry county. Daniel Eckles met me, and told me to come to Harper's office, and the money would be paid. I went and got the ,bond, and met Eckles and Harper at Harper's office; and the money was paid there in the office. It was counted by them both. I can't tell which paid or furnished the money.

" *Cross-examination.*—Mr. Eckles and I had not spoken on any subject for years before; we were not on speaking terms.

" Question: Did not Mr. Eckles, when he met you at Irvine's corner, say to you, that he was ready to pay that bond?

" Answer: To the best of my recollection, Eckles said to me, to come to Harper's office, and the bond would be paid.

" Question: Did you not tell Eckles, at that time, that you had not the bond with you?

" Answer: I did tell him I had not the bond with me; it was at my office.

" Question: Did he not ask you then where he would meet you to pay it?

" Answer: My recollection is, that Harper's office was mentioned, and no other place.

" Question: State if Mr. Eckles was in Harper's office when you returned with the bond?

" Answer: I am not able to say if he was there then, but was there a very few minutes after.

" Question: Were you acquainted with Mr. Harper and his circumstances?

" Answer: I was.

" Question: What were his circumstances in regard to money matters?

" Answer: I have no knowledge of myself, but the public says he is poor. [Objected to by defendants' counsel.]

" Question: Would you have bought any paper on Mr. Harper within the last year or two?

" Answer: I would not.

" Question: Was not Mr. Harper exceedingly embarrassed in money matters within the last year or two?

" Answer: He had the character of being embarrassed. [Objected to by defendants' counsel.]

" Question: Did you not tell Mr. Brandebury, before the bond was paid, that unless it was paid you would have it entered up?

" Answer: I did tell Mr. Brandebury unless it was paid it would be entered up.

" Question: State if it was not after you had been speaking to Brandebury, that John Harper spoke to you on the subject?

" Answer: It was.

" Question: State if you had any conversation with Harper before the bond was due?

" Answer: I had no conversation with Harper before the bond was due.

" *In chief:* State if Harper and Eckles were very intimate?

"Answer: I believe they were.

"Question: State if Eckles did not buy a good deal of Harper's property, and hold it in trust for Harper?

"Answer: I understood he did.

"Captain George Ege, also duly sworn, says—

"[Captain George Ege objected to as a witness by the plaintiffs, —it is further objected that the declarations of John Harper are inadmissible as evidence.]

"After the bond was paid in question, as I understood, and after the attachment was issued and application for sequestrator was made against Mrs. Miller, to attach her rents and have them sequestered, I met Mr. Harper at his office door. I asked him what was the meaning of all those proceedings against Mrs. Miller? [He stated that it was for the cost arising out of the suit of the Farmers' and Mechanics' Bank against himself and Mrs. Miller. I told him that it was very hard that she should be brought in, as she took no part in the trial of the suit in court. He then told me it was Eckles that was pushing the thing. I then told Harper that 1 had called on Mr. Showers, to ascertain how the matter stood. I told Harper that Showers had told me that he, Harper, had called on Showers, and requested him to wait until he would return from Perry county, and that he would pay it as soon as he would come home. Harper then stated to me, that the payment of the bond was made out of his (Harper's) money; and if it had not been for Eckles, there would never have been anything said about it against Mrs. Miller; but, says he, you know how I stand with Eckles. I am under his thumb, and he (Eckles) has many of my matters in his hands, and I can't quarrel with him; or something to that amount. He further told me, if you speak to Eckles and get him reconciled, I will say nothing more about it. I did not speak to Eckles, that I recollect of; but I communicated the substance of the conversation I had with Mr. Harper to Michael Holcomb. He (Holcomb) denied that Harper had paid the money; he said it was not so.]

"Lemuel G. Brandebury, being duly sworn according to law, doth depose and say: I was counsel for the Farmers' and Mechanics' Bank, in the case of said bank against John Harper and Sarah Miller. It was an action of ejectment; and the plaintiff recovered a verdict and judgment in the Court of Common Pleas; from which the defendants removed the same, by a writ of error, to the Supreme Court. John Harper, Michael Holcomb, and Daniel

Eckles entered into a recognisance therefor, in the sum of $300, upon the usual conditions.

" The judgment of the Court of Common Pleas was affirmed by the Supreme Court; and William Grimshaw, attorney in fact for the Farmers' and Mechanics' Bank, authorized and directed me to receive and retain the costs in the said action, on account of services rendered to said bank. At my request, Mr. Grimshaw wrote and signed the *præcipe* for the action upon the recognisance, in the case of the said bank against John Harper, Michael Holcomb, and Daniel Eckles, to recover the costs. I filed the declaration, and the cause was put to issue, and for trial. The cause was down for trial, I think, several times, and as I had some misgivings about a recovery, in consequence of some irregularity in the taxation of the costs, and as Daniel Eckles complained of the hardship of having to pay these costs, without having had any interest in the suit with either John Harper or Sarah Miller, I proposed, before the trial came on, that if he, Daniel Eckles and Michael Holcomb, would give their judgment bond for the amount of the costs in the case of the Bank *v.* Harper and Miller, I would assign the judgment to them, and they could recover the same from John Harper or Sarah Miller, or both. I explained to Mr. Eckles the importance of this mode of proceeding to him, and how foolish he would be to suffer a verdict and judgment to be entered in the suit then pending against himself, Holcomb, and Harper, inasmuch as nothing could be got from Harper, and he would have to bring a new action against Mrs. Miller, if he could even reach her at all by an action. I told him if he and Holcomb would give the bond, I would assign the judgment to them, and they could proceed against Harper or Miller in the name of the bank for their use, but that the assignment would be at their own risk, and without any recourse to the bank or myself. Mr. Eckles agreed then to give the bond, and take an assignment of the judgment. I drew up the bond, and Eckles and Holcomb signed it, and I assigned the judgment to them.

" Some time after the bond was given and before it was due, I inquired of Mr. Eckles if it would be convenient for him to pay it at a small discount. We chaffered about the discount, and disagreed. He reminded me of the understanding that the bond was not to be entered up before it was due, and said it should be paid when due, as he would not have it entered against him on any account. I transferred the bond to Edward Showers, and informed Eckles of the fact, and also that it would not be

Y

entered up before due, but that I supposed Showers would do so as soon as it was due, as he and Eckles were not on good terms. When it became due, I informed Eckles of it, and think I told him Showers had spoken to me on the subject. The bond was paid, as I understood from Showers and Eckles. I never heard it disputed that Eckles paid the money, until I heard the application to set aside the proceedings on the judgment against Harper and Miller.

" The costs in the case of the Bank *v.* Harper, Holcomb, and Eckles, were to have been paid by Major Harper. He said he would arrange the same with Mr. Beetem, the prothonotary, and as I supposed out of costs which were received by the prothonotary for Harper, he having been prothonotary some years before.

" Major Harper had a knowledge of the whole transaction, and was a witness to the bond, I think ; but the part he took, so far as I knew, was in consequence of Holcomb and Eckles having entered into the recognisance of bail in error, and about being compelled to pay the money, and his solicitude to aid them in any way he could, to save themselves from the loss of the amount, if it could be done. The costs included in the bond I think amounted to one hundred and seventeen dollars and thirteen cents.

" [Counsel for Sarah Miller objects to the whole of the foregoing deposition of L. G. Brandebury, Esq., and particularly with all or any conversation with Daniel Eckles, in the absence of Mrs. Miller ; no objection to the deposition being in the handwriting of the witness.]

" *Cross-examination.*—I have no personal knowledge of Mrs. Miller taking any part in person in the case of the Bank against John Harper and Sarah Miller. But when the action was transferred from the Quarter Sessions to the Common Pleas, the names of Mrs. Miller and John Harper were placed upon the records by consent of John Harper and Captain George Ege, acting as the agent of Mrs. Miller.

" John M. Woodburn being duly sworn, deposes and says : [The testimony of John M. Woodburn objected to by Hugh Gaullagher, counsel for defendant. Any conversation Mr. Woodburn had with John Harper, on the subject now inquiring into, is objected to.] I came to town and went to Major Harper's office to arrange some business ; and in conversing about the arrangement, I spoke of getting Daniel Eckles to carry out the arrangements. Harper said it was not worth while to call upon Eckles, because he was very angry about having to borrow the money to pay the bond given for the cost in the suit of the Farmers' and Mechanics' Bank,

to recover the Moses Foulk survey. Mr. Harper went on to state that the bond was in the hands of Mr. Brandebury against Eckles and Holcomb; that Holcomb could not pay his half of the bond; and he (Harper) had failed to pay Eckles half. In a few days after this conversation, I returned to Mr. Harper's office again. I asked Mr. Harper for the loan of some money; he told me that he could not lend me any, because he had not got it, and that he never was as scarce of funds before; that he was in such a condition himself, and got Daniel Eckles in such a condition, as that he (Eckles) had to go and borrow the money to lift the bond; that Brandebury had transferred the bond to Mr. Shower; and that if he had not paid it, would have been entered against him; I mean that Eckles had to go and borrow the money. He (Harper) said he had nothing for some length of time that hurt his feelings so much as to compel Eckles to pay this money. Harper stated frequently to me afterwards, that it was all a fudge, that he (Harper) had never paid a cent of the money. Mr. Harper said it was a fudge, that he (Harper) had ever paid the money.

"*Cross-examined.*—Question.—If there was not a very intimate business relationship existing between John Harper and Daniel Eckles? [Objected to.]

" Yes, there was.

" Question : State all you know on the subject of that relationship, as to his purchasing property or anything else in trust for Mr. Harper. [Objected to.]

" Answer : I don't know anything about an agreement or arrangement of Eckles purchasing anything in trust for Mr. Harper. Mr. Eckles did make purchases of Harper's property. The first purchase was the time the sheriff sold Mr. Harper's personal property. Mr. Eckles purchased nearly all the personal property of Mr. Harper. I think a part of the property has remained with the family until the present time. I was present at the sale, when Mr. Eckles bought. I think Mr. Eckles purchased two hogs for Mr. Harper.

" *In chief* : Mr. Harper said that Daniel Eckles [this objected to] had done more for him than any of his relations; that he (Harper) had not a cent frequently to go to market with; that he had sent to Mr. Eckles, and that he had furnished him with money. Eckles frequently complained to Harper, in my presence, that he was scarce of money; Mr. Harper replied, that he did not know how he would pay him what he owed him. [This objected to.]

" John Reed, having been duly sworn, says : That he was

employed as counsel by John Harper, Esq., on the ejectment case referred to, Farmers' and Mechanics' Bank v. John Harper and Sarah Miller. Mr. Biddle and he were the counsel in the Court of Common Pleas, and argued it in the Supreme Court. This deponent was employed by John Harper, Esq., alone, and only appeared for him. The writ of error was taken out at the instance of Mr. Harper. This defendant wrote the *præcipe* for the writ of error, and the form of the oath and recognisance. Mrs. Miller was not present, nor any one for her; nor was she, or any one for her, counselled on the subject, so far as my knowledge extends. Mr. Harper alone agreed to give the compensation stipulated between him and Mr. Biddle, and this deponent, for their services.

" I was not concerned in the case in the Quarter Sessions, out of which this ejectment sprung. I was present in court when the trial of the indictment commenced, and was concerned in an ejectment. I recollect that Mr. Harper, after the trial, complained of the fact of his being made defendant, in the ejectment growing out of the indictment, and exposed to the costs of the indictment, in which he was not a party. [Cross-examination excepted to by Mr. Gaullagher.]

" Wm. M. Biddle, being duly sworn, deposes and saith: I do not remember anything of the taking out the writ of error—John Harper and Sarah Miller, plaintiffs in error, v. Farmers' and Mechanics' Bank, defendants in error. I argued the case in the Supreme Court, but the præcipe for the writ is in Judge Reed's handwriting, and is signed by him, Biddle & Reed.

" *Cross-examined.*—I was concerned originally in the case in the Quarter Sessions, out of which the ejectment in the Common Pleas, and the subsequent writ of error, above referred to, arose. I was concerned for George Ege. When the case in the Sessions came on for trial, after the commonwealth had given their evidence in chief, I opened the defence. I stated in the opening that the timber had been cut by George Ege, Esq., and his hands, and that it had been so done under colour of title; that Mrs. Miller had a title to the land on which the cutting had been done; and that Mr. Ege had acted as agent; and that John Harper also had a tax-title to the land; and that the timber cut by Captain Ege had been done so with the consent and approbation of Mr. Harper. My recollection is, that, after the opening was made, and before any evidence was given in for defendants, that it was suggested by the court that the case should be converted into an ejectment, and the costs already accrued should abide the result. Mr. Reed and deponent consulted with John

Harper in relation to the matter, and Mr. Harper agreed that it should be so done, and he made a party. I have stated that Judge Reed and I consulted with Harper—I may be mistaken in this— possibly it was Mr. Gaullagher. Captain Ege was satisfied with the arrangement as made. In the suit of the Farmers' and Mechanics' Bank against John Myers and George Ege, title in Mrs. Miller was set up by defendants, and Captain Ege represented that he was acting as the agent or attorney in fact for Mrs. Miller. On the trial of the case last mentioned, Captain Ege produced two deeds of an old date, from himself to Mrs. Miller (which had never been recorded), and a general power of attorney from her to him. One of these deeds related to the Wolf tract, the other to the land on which the alleged cutting had taken place, for which Mr. Ege was indicted. In relation to Mrs. Miller's name appearing in the eject- ment along with John Harper's, my recollection is indistinct, but my impression is, that it was placed there at the suggestion of the counsel of the bank, who wished to include both the persons under whom Captain Ege alleged he cut timber, in the case in Quarter Sessions, in this ejectment, so as to settle the title. In the eject- ment case, my agreement for a fee was alone with John Harper."

*Brandebury* and *Watts*, for plaintiffs in error.—This ejectment was substituted for an indictment against George Ege for cutting timber, who claimed to relieve himself, on the ground that he entered on the premises by authority of a license from Sarah Miller: she was, therefore, the germ from which all this fruitless litigation had its growth : she suffers herself to be made a party to the ejectment with Harper : judgment is rendered against them both : they both prosecute a writ of error : the securities in the recognisance were for both the plaintiffs in error, and these securi- ties, upon the affirmance of the judgment, paid the costs, upon the defendants' assigning to them the judgment. It is now said that this judgment was not the subject of assignment, because it was a judgment in an action of tort: now, although it may be that a cause of action sounding in tort, may not be assignable, but cer- tainly, when a judgment is recovered in such cause of action, it is assignable, or, upon the death of the plaintiff, passes to his per- sonal representative: the only question then is, was the money paid by the surety, and did he, in consideration thereof, take an assign- ment? And the proof in the case shows clearly that he did. The witness, Mr. Showers, states distinctly, that Harper and Eckles were both present when the money was paid to him, and he does

not know which paid it—Mr. Eckles did pay it, and did take the receipt for it to himself. If Mr. Harper did say that he paid it, he said again that he did not, but what he said cannot prejudice the plaintiffs' rights ; he was interested, and his interest was to say that he had paid it.

*Gaullagher*, contra.—The assignment to Eckles and Holcomb was without consideration. They were liable on their recognisance for the costs. An action on the recognisance was pending and ready for trial; when they gave their judgment-bond, and took an assignment. This assignment was without consideration, as regards Mrs. Miller; and they were not purchasers for a valuable consideration. The judgment was payment or satisfaction of the recognisance. It created no new or additional liability against Eckles and Holcomb; and it did not therefore create a new consideration for the assignment. The bond and assignment did not place Eckles and Holcomb either in a worse or better situation than they were under the recognisance. When Harper paid the money, or they for him, the judgment against Mrs. Miller was satisfied. Harper paid the bond; or, at all events, furnished the money to pay it. The *fieri facias* and attachment were, therefore, rightly set aside. If, however, Harper did not pay, and Eckles and Holcomb did pay, they are in no better situation than their principal, who on payment and taking an assignment, could not recover against Mrs. Miller, on the principle settled in Peck *v*. Ellis, 2 Johns. Ch. Ca. 131; 6 Watts, 224; and in 12 Wend. 298.

*June* 12. ROGERS, J.—If the costs were paid with the money of Harper, the court was right in setting aside the execution; but although this is alleged, the testimony is too light and contradictory to afford a safe rule for our government. The weight of the evidence certainly is, that they were paid by Eckles, one of the sureties in the recognisance. Divesting the case of this assumed fact, this is the ordinary case of a judgment against two persons, fixing them for the costs on execution against both, and a levy on the property of one, the other being insolvent. Whether Mrs. Miller, the complainant, was properly one of the defendants in the ejectment, we cannot now inquire. She appears on the record as such, and it is too late, when the execution for costs is issued, to allege she had no interest in the controversy. Her remedy, if any, is against those who without authority made her a party to the original action. It is very certain the sureties had nothing to do with the controversy in its commencement, and

ought not to be affected by the improper conduct (if it existed, which I doubt,) of those who undertook to act for her.   It is said, she was no party to the writ of error—but this is an error; for the writ was sued out in the name of both, by the attorney of both: and Eckles and Holcomb were the sureties of both.   By entering into the recognisance, they became jointly and severally bound for payment of costs; and of course Mrs. Miller as well as Harper may be compelled, by execution, to refund the amount paid.

But exception is taken to the execution on another ground.   It is said, that the costs paid to the plaintiff by a joint trespasser, or even by his surety in a bond on a writ of error conditioned for their payment, is a satisfaction; and a sale of a judgment for them to such bail, furnishes no additional means for him to make them form a co-defendant with his principal in the recognisance; and more especially so, when that principal is shown by the record to have been the real defendant in the action in which they are received.   The court are of the opinion, that even if the recognisance was paid by Eckles, he had no right to be substituted in the room of the plaintiff in the ejectment, or to have the judgment marked for his use, so as to select which of the defendants he pleases to make the costs from.   We do not perceive the force of the remark, that Mrs. Miller was not the principal in the ejectment; for admitting she was not, nevertheless, she is answerable to the plaintiff as a co-defendant for the costs which follow the judgment. Nor do we think it of any moment whatever, that the original action was trespass in ejectment; for where judgment is rendered, whether the action be tort or contract matters not.   In either case it is assignable, either to a third person or to a surety in the writ of error.   It is not a case of substitution, but a transfer of the judgment for a valuable consideration, which there is nothing to prevent.   We therefore see nothing exceptionable in taking an assignment of the judgment by the bail, and proceeding to coerce payment by execution, as in ordinary cases.   They were compelled to pay, and had a perfect right to take a transfer of the judgment, as an indemnity.   This view of the case would hardly admit of doubt, were we not unconsciously swayed by the supposition of what there is no adequate proof, that the execution was the result of a contrivance between Harper and Eckles to throw the costs on Mrs. Miller.   If that had been proved, we agree the action of the court in setting aside the execution would be proper.

The order of the court, making the rule absolute to quash the attachment and set aside the execution, is reversed.